# EXHIBIT A

Electronically FILED by Superior Court of California, County of Riverside on 12/16/2024 08:06 PM
Case Number CVRI2407225 0000114214184 - Jason B. Galkin, Executive Officer/Clerk of the Court By Melinda Criel, Clerk

Gerald Singleton (SBN 208783)
gsingleton@singletonschreiber.com
Paul Starita (SBN 219573)
pstarita@singletonschreiber.com
Britt K. Strottman (SBN 209595)
bstrottman@singletonschreiber.com
James Fendt (SBN 346552)
jfendt@singletonschreiber.com
SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025
San Diego, CA 92108
Tel. (619) 771-3473

Attorneys for Plaintiff

**Government Agency Exempt from Filing Fees (Government Code 6103)**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF RIVERSIDE**

WESTERN MUNICIPAL WATER DISTRICT, a California public entity,

Plaintiff,

v.

THE 3M COMPANY (f/k/a Minnesota Mining and Manufacturing Co.);
TYCO FIRE PRODUCTS, L.P., successor-in-interest to The Ansul Company;
JOHNSON CONTROLS INTERNATIONAL, PLC;
CHEMGUARD, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
E.I. DUPONT DE NEMOURS AND COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise;
THE CHEMOURS COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise;
THE CHEMOURS COMPANY FC, LLC, individually and as successor in interest to DuPont Chemical Solutions Enterprise;
CORTEVA, INC.;
DUPONT DE NEMOURS INC., f/k/a/ DOWDUPONT, INC.;
ARKEMA INC.;
AGC CHEMICALS AMERICAS INC.;
DYNAX CORPORATION;
CLARIANT CORPORATION;
BASF CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
AMEREX CORPORATION;
ARCHROMA MANAGEMENT LLC;
DEEPWATER CHEMICALS, INC.;

Case No.: CVRI2407225

Unlimited Jurisdiction

**COMPLAINT FOR DAMAGES**

**(1) Nuisance**
**(2) Negligence**
**(3) Defective Product – Failure to Warn**
**(4) Defective Product – Design Defect**
**(5) Private Nuisance**
**(6) Trespass**
**(7) Unjust Enrichment**

**JURY TRIAL DEMANDED**

NATION FORD CHEMICAL COMPANY; and CHEMICALS, INC.

Defendants.

1. Plaintiff WESTERN MUNICIPAL WATER DISTRICT ("Western Water") by and through their undersigned counsel, files this action against THE 3M COMPANY (f/k/a Minnesota Mining and Manufacturing Co.)("3M"); TYCO FIRE PRODUCTS, L.P., successor-in-interest to THE ANSUL COMPANY ("Tyco"); JOHNSON CONTROLS INTERNATIONAL, PLC ("Johnson Controls"); CHEMGUARD, INC., BUCKEYE FIRE EQUIPMENT COMPANY; E.I. DUPONT DE NEMOURS AND COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise; THE CHEMOURS COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise; THE CHEMOURS COMPANY FC, LLC, individually and as successor in interest to DuPont Chemical Solutions Enterprise; CORTEVA, INC.; DUPONT DE NEMOURS INC., f/k/a/ DOWDUPONT, INC.; ARKEMA INC.; AGC CHEMICALS AMERICAS INC.; DYNAX CORPORATION; CLARIANT CORPORATION; BASF CORPORATION; CHEMDESIGN PRODUCTS, INC.; AMEREX CORPORATION; ARCHROMA MANAGEMENT LLC; DEEPWATER CHEMICALS, INC.; NATION FORD CHEMICAL COMPANY; and CHEMICALS, INC. (collectively referred to herein as the "Manufacturers" or "Defendants").

**General Allegations**

2. This action arises from Defendants' continuous and foreseeable contamination of wastewater through aqueous film-forming foam products ("AFFF") that contained per- and poly-fluoroalkyl substances ("PFAS"), including perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA").

3. This Complaint seeks damages for the cost of testing, remediation, monitoring, treatment, and/or processing of wastewater to remove and/or remediate PFAS from its permitted wastewater facility owned and operated by Plaintiff and which is separate and unrelated to its Public Water Systems and which damages do not arise out of causes to drinking water or wastewater that will be used for drinking water.

4. PFAS are a group of toxic, extremely persistent, and bioaccumulative synthetic chemicals. When consumed by humans, PFAS can cause numerous and serious health impacts, including but not limited to kidney cancer, testicular cancer, thyroid disease, and ulcerative colitis.

5. Opened in 1918, the March Air Reserve Base ("March ARB"), previously known as March Air Force Base, is located in Riverside County, California between the cities of Riverside, Moreno Valley, and Perris.

6. Air Force activities at March ARB, as elsewhere, involved a wide variety of operations that required the use, storage, and disposal of hazardous materials, including fuel and solvents.

7. From the 1970s until at least March 3, 2023, when the Air Force agreed to stop using AFFF for fire suppression, the Air Force purchased toxic PFAS-based firefighting foam from Manufacturers and used those PFAS-containing AFFF at March ARB and discharged and disposed of AFFF on land and in water at March ARB.

8. Plaintiff Western Water is a special district, created to provide water supply, wastewater disposal, and recycled water services to nearly one million customers across 527 square miles in western Riverside County. Plaintiff has owned, operated, and maintained March ARB's water and sewer services since 2002.

9. The PFAS component of the AFFF has migrated from March ARB and entered Plaintiff Western Water's sewer system and facilities, either directly through discharge from a sewage drain lateral, or indirectly through groundwater infiltration, thus interfering with Plaintiff's recycled water and biosolids production.

10. Manufacturers produced, manufactured, distributed, and/or sold the AFFF with knowledge of the toxic effects that the AFFF chemicals, which included the PFAS chemicals PFOS and PFOA, would cause if they were released into the environment, and lacked adequate warning of those effects.

11. Manufacturers knew or should have known that PFAS are highly soluble in water, highly mobile, highly persistent in the environment, and highly likely to contaminate water supplies if released into the environment. Additionally, Manufacturers, distributers, and/or sellers of AFFF also knew or should have known that the inclusion of PFAS in AFFF presented an unreasonable risk to

human health and the environment.

12. Despite Manufacturers' knowledge of the human health and environmental risks associated with AFFF's toxic chemicals, Manufacturers marketed, distributed, and/or sold their AFFF to the Air Force with knowledge that large quantities of toxic AFFF would be used in training exercises, in fire control, in fire sprinkler systems, in emergency situations, and in other ways at Air Force bases such that PFAS and other contaminants would be released into the environment.

13. As a direct and proximate result of Manufacturers' negligent development, manufacturing, distribution, marketing, and/or sale of AFFF, wastewater relied upon by Plaintiff has been contaminated with PFAS due to the use of AFFF at March ARB.

14. To remediate the contamination and ensure that it can process wastewater in compliance with regulatory requirements, Plaintiff Western Water has taken and will have to continue to take actions to minimize the presence of PFAS chemical in its sewer systems, as well as address the contamination of wastewater, biosolids, and treatment plants caused by Defendants.

15. As a result of the contamination caused by Defendants, Plaintiff Western Water has incurred, and will continue to incur damages, significant expenses and losses associated with remediating current wastewater contamination and mitigation of ongoing and future contamination.

16. The United States purchased toxic PFAS-based firefighting foam from Manufacturers and stored the toxic PFAS-based firefighting foam in such a manner that the water at March ARB became contaminated.

17. The United States Air Force used and continues to use the toxic PFAS-based firefighting foam on March ARB and surrounding facilities.

18. The United States Air Force purchased toxic PFAS-based firefighting foam from Manufacturers and discharged and disposed, and continues to discharge and dispose, of the toxic PFAS into the environment, through activities including spraying, storing, and placing PFAS-containing firefighting foams on land and water at March ARB.

19. Thus, through their development, design, manufacture, production, distribution, marketing, and sale of AFFF, including to the United States Air Force, the Manufacturers are liable for Plaintiff's injuries and damages, including punitive damages, proximately caused by the

Manufacturers' contamination of groundwater with AFFF.

**The Parties**

**A. Plaintiff**

20. Plaintiff Western Municipal Water District is a member of the Metropolitan Water District of Southern California ("Western Water") and is one of the largest public agencies in Riverside County. Western Water was formed in 1954 as an independent, special district under the Municipal Water District Act of 1911. (Cal. Water Code §§71050-71052). Plaintiff serves roughly 37.8% of all residents in Riverside County. In California, "special districts" are quasi-governmental agencies synonymous with water "districts", that are formed through general law or special acts "for the performance of governmental or proprietary functions within limited boundaries," and occasionally outside district boundaries. (Cal. Gov. Code §56036.) Water districts have the additional responsibilities of managing "irrigation, reclamation, or drainage of land or the diversion, storage, management, or distribution of water primarily for domestic, municipal, agricultural, industrial, recreation, fish and wildlife enhancement, flood control, or power production purposes." (Cal. Water Code §20200.) To fulfill their purposes, water districts are empowered to "sue," unless prohibited by law, "in all actions and proceedings in all courts and tribunals of competent jurisdiction." (Cal. Water Code §74640.)

21. Western Water's principal place of business is located at 14205 Meridian Parkway, Riverside, CA 92518. Western Water provides drinking water, wastewater, and recycled water to nearly one million people across 527-square miles in western Riverside County. Further, Western Water supplies water to approximately 25,000 retail customers and eight wholesale customers with water from the Colorado River, State Water Project, and groundwater. Western Water serves customers directly in the areas of Orangecrest, Mission Grove, El Sobrante, Eagle Valley, Temescal Canyon, Woodcrest, Lake Matthews, portions of Mead Valley, and notably, March ARB. Western Water also provides supplemental water beyond Riverside to the cities of Corona and Norco, as well as the water agencies of Box Springs Mutual, Eagle Valley Mutual, Elsinore Valley, Lee Lake, and Rancho California.

22. Western Water owns and operates two water treatment facilities: the Western Riverside County Regional Wastewater Authority ("Regional Plant"), located in Corona, California, and the

Western Water Recycling Facility ("Recycling Facility"), located in Riverside, California, just outside of March ARB. The Regional Plant treats up to fourteen million gallons of wastewater per day. The Regional Plant was formerly March ARB's wastewater system, before Western Water took ownership in 2002. The Recycling Facility has a capacity to treat up to three million gallons per day. These treatment systems withdraw, treat, and deliver former wastewater for various public and private uses.

**B. <u>Defendants</u>**

23. Defendant 3M is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55133. Beginning before 1970 and until at least 2002, 3M manufactured, distributed and sold AFFF. Defendant 3M sold military specification AFFF foam that contained PFAS to the Air Force that was then distributed to and used at Air Force locations including March ARB.

24. Defendant Tyco is a limited partnership organized and existing under the laws of the State of Delaware, having its principal place of business at One Stanton Street, Marinette, Wisconsin 54143. Tyco manufactures the Ansul brand of products and is the successor-in- interest to the corporation formerly known as The Ansul Company (hereinafter "Ansul" and included in any reference to Tyco).

25. At all times relevant, Tyco manufactured, distributed, and/or sold fire suppression products, including AFFF that contained fluorocarbon surfactants and PFAS. Defendant Tyco manufactured, distributed, and/or sold military specification AFFF foam to the Air Force that was then distributed and used at Air Force locations including March ARB.

26. Defendant, Johnson Controls is a corporation organized and existing under the laws of Ireland, having a principal place of business at 5757 N. Green Bay Ave., Milwaukee, WI 53209. On or about September 2, 2016, Johnson Controls merged with a subsidiary of Tyco's parent company, Tyco International plc, named Jagara Merger Sub LLC. Johnson Controls was the surviving corporation. After the merger, Tyco International plc changed its name to Johnson Controls International plc.

27. Tyco is an indirect subsidiary wholly owned by Johnson Controls. Since on or around September 2, 2016, Tyco and Johnson Controls have maintained service agreements under which Johnson Controls provides certain services, including environmental consulting and management, to

Tyco. Since that time, Johnson Controls has authorized, supervised, directed, performed, or failed to perform the acts alleged in this Complaint.

28. Defendant Chemguard is a Texas corporation having its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

29. Chemguard, acquired by Tyco in 2011, is an indirect subsidiary wholly owned by Johnson Controls.

30. At all times relevant, Chemguard designed, manufactured, and sold AFFF containing PFAS that was used in training operations and to fight fires at numerous military bases and other locations throughout the country, including at March ARB.

31. National Foam, Inc. (a/k/a Chubb National Foam) is a Delaware corporation, having a principal place of business at 141 Junny Road, Angier, North Carolina 27501.

32. At all times relevant to the present litigation, National Foam Inc. designed, manufactured, and sold AFFF containing PFAS that was used for training and to fight fires at numerous airports and other locations throughout the country, including March ARB.

33. Kidde Fire Fighting, Inc., f/k/a Chubb National Foam, Inc., f/k/a National Foam Inc., is a Pennsylvania corporation having a principal place of business at One Carrie Place, Farmington, Connecticut 06032. At all times relevant to the present litigation, Kidde Fire Fighting, Inc. designed, manufactured, and sold AFFF containing PFAS that was used in training operations and for emergency fire-fighting situations, including at March ARB.

34. Kidde PLC, Inc., f/k/a Williams US Inc., f/k/a Williams Holdings, Inc., is a Massachusetts corporation having a principal place of business at One Carrier Place, Farmington, Connecticut 06302. At all times relevant to the present litigation, Kidde PLC, Inc. designed, manufactured, and sold AFFF containing PFAS that was used in training operations and for emergency fire-fighting situations, including at March ARB.

35. Kidde-Fenwal, Inc. is a Massachusetts corporation with its principal place of business at 400 Main Street, Ashland, Massachusetts 01721. At all times relevant to this litigation, Kidde- Fenwal, Inc. designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations, including at March ARB.

36. Upon information and belief, Fenwal, Inc. was incorporated on June 21, 1988, and later changed its name to Kidde-Fenwal, Inc.

37. Upon information and belief, the Canadian Intellectual Property Office has registered the National Foam trademark to Kidde-Fenwal, Inc., formerly registered to Kidde Fire Fighting, Inc.

38. UTC Fire & Security Americas Corporation, Inc., f/k/a GE Interlogix, Inc., is a North Carolina corporation with its principal place of business at 3211 Progress Drive, Lincolnton, North Carolina 28092. At all times relevant to this litigation, UTC Fire & Security Americas Corporation, Inc. designed, manufactured, and sold AFFF used for training operations and fighting fires, including at March ARB.

39. Upon Plaintiff's information and belief, Kidde-Fenwal, Inc. is part of the UTC Climate Control & Security unit of United Technologies Corporation.

40. Enterra Corporation is a Massachusetts corporation. At all times relevant, Enterra Corporation designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations at numerous airports, including at March ARB.

41. Upon information and belief, Enterra Corporation is the current holder of the National Foam trademark.

42. Carrier Global Corporation ("Carrier") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418.

43. On information and belief, Carrier was formed in March 2020 when United Technologies Corporation spun off its fire and security business prior to merging with Raytheon Company a month later. On information and belief, Carrier became successor in interest to Kidde-Fenwal as part of the spin off and is legally responsible for the liabilities arising from Kidde- Fenwal's design, manufacture, marketing, sale, and/or distribution of AFFF.

44. National Foam, Inc.; Kidde Fire Fighting, Inc., f/k/a Chubb National Foam, Inc., f/k/a National Foam Inc., individually and as successor in interest to National Foam, Inc.; Kidde Plc, Inc., f/k/a Williams US Inc., f/k/a Williams Holdings, Inc., individually and as successor in interest to National Foam, Inc.; Kidde-Fenwal, Inc., individually and as successor in interest to National Foam,

Inc.; UTC Fire & Security Americas Corporation, Inc., f/k/a GE Interlogix, Inc.; Enterra Corporation; and Carrier Global Corporation, individually and as successor in interest to National Foam, Inc. shall collectively be referred to herein as "National Foam."

45. At all times relevant to the present litigation, National Foam designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations, including at March ARB.

46. Defendant Buckeye Fire Equipment Company ("Buckeye Fire") is a corporation organized and existing under the laws of the state of Ohio, with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086. Buckeye does business throughout the United States, including conducting business in California.

47. At all times relevant to the present litigation, Buckeye designed, distributed, manufactured and/or sold AFFF containing PFAS used in training operations and for emergency fire-fighting situations, including at March ARB.

48. DuPont Chemical Solutions Enterprise ("DuPont Chemical") was a Delaware corporation, with a principal place of business located at 1007 Market Street, Wilmington, Delaware 19898.

49. DuPont Chemical was a member of the Telomer Research Program ("TRP"). As a member, it was required to provide a list and volume of products it was selling in the United States on a yearly basis.

50. In a letter addressed to the Office of Pollution Prevention and Toxics ("OPPT") Document Control Office, dated May 14, 2003, and signed by Stephen H. Korzeniowski, DuPont provided its list of telomer-based sales products in the United States for the year 2002.

51. The letter, which was redacted and sent to the EPA under its PFOA Stewardship Program, included AFFF sales volume, on an active ingredient pound basis, as well as its Chemical Abstracts Service (CAS) number and chemical name, and is included in the PFOA Stewardship Program Docket.[1]

52. Upon information and belief, at all times relevant to the present litigation, DuPont

[1] https://www.regulations.gov/docket?D=EPA-HQ-OPPT-2006-0621, last accessed 9.22.20.

Chemical designed, manufactured and sold AFFF used for training and to fight fires at numerous airport locations across the United States, including March ARB.

53. Defendant, E.I. DuPont de Nemours and Company ("E.I. DuPont"), successor in interest to DuPont Chemical, is a Delaware corporation and does business throughout the United States, including conducting business in California. Its principal place of business is 974 Centre Road, Wilmington, Delaware 19805.

54. Upon information and belief, at all times relevant to the present litigation, E.I. DuPont designed, manufactured and sold AFFF containing PFAS used for training and to fight fires at numerous airports and other locations throughout the country, including March ARB.

55. Defendant The Chemours Company ("Chemours"), successor in interest to DuPont Chemical, is a Delaware corporation and conducts business throughout the United States, including conducting business in California. Its principal place of business is 1007 Market Street, Wilmington, Delaware, 19889.

56. Chemours was incorporated as a subsidiary of E.I. Du Pont as of April 30, 2015. From that time until July 2015, Chemours was a wholly owned subsidiary of E.I. DuPont. In July 2015, E.I. Du Pont spun off Chemours and transferred to Chemours its "performance chemicals" business line, which included the fluoroproducts business, distributing shares of Chemours stock to E.I. Du Pont stockholders, and Chemours has since been an independent, publicly traded company.

57. Upon information and belief, at all times relevant to the present litigation, Chemours designed, manufactured, and sold AFFF containing PFAS used for training and to fight fires at numerous airports and other locations throughout the county, including March ARB.

58. E.I. Du Pont merged with The Dow Chemical Company in August 2017 to create DowDuPont Inc. ("DowDuPont"). E.I. Du Pont and The Dow Chemical Company each merged with wholly-owned subsidiaries of DowDuPont and, as a result, became subsidiaries of DowDuPont. Since that time, DowDuPont has affected a series of separation transactions to separate its businesses into three independent, publicly-traded companies for each of its agriculture, materials science, and specialty products businesses, discussed below.

59. Defendant The Chemours Company FC L.L.C. (" Chemours Company"), successor in

interest to DuPont Chemical, is a Delaware corporation and conducts business throughout the United States, including conducting business in California. Its principal place of business is 1007 Market Street Wilmington, Delaware, 19899.

60. Upon information and belief, at all times relevant to the present litigation, Chemours Company designed, manufactured and sold AFFF containing PFAS used for training and to fight fires at numerous airports and other locations throughout the country, including March ARB.

61. Defendant DuPont de Nemours Inc., formerly known as DowDuPont, Inc., is a Delaware corporation that conducts business throughout the United States, including business in California. Its principal place of business is 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

62. Upon information and belief, at all times relevant to the present litigation, DuPont de Nemours manufactured, designed and sold AFFF and/or PFAS components in AFFF that was used at March ARB.

63. Defendant Corteva, Inc. ("Corteva") is a Delaware corporation that conducts business throughout the United States, including business in California. Its principal place of business is 974 Centre Rd., Wilmington, Delaware 19805.

64. On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva, Inc.

65. Corteva, Inc. was initially formed in February 2018. From that time until June 1, 2019, Corteva was a wholly owned subsidiary of DowDuPont.

66. On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva, Inc. common stock by way of a pro rata dividend. Following that distribution, Corteva, Inc. is the direct parent of Du Pont and holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

67. Upon information and belief, at all times relevant to the present litigation, Corteva designed, manufactured and sold AFFF and/or PFAS constituents in AFFF that was used at March ARB.

68. On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva, Inc. and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as

DuPont ("New DuPont"). New DuPont retained assets in the specialty products business lines following the above-described spin-offs, as well as the balance of the financial assets and liabilities of E.I. DuPont not assumed by Corteva, Inc.

69. Defendants E. I. du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; DuPont de Nemours, Inc. are collectively referred to as "DuPont" throughout this Complaint.

70. Defendant Dynax Corporation is a Delaware Corporation that conducts business throughout the United States, including business in California. Its principal place of business is 103 Fairview Park Drive, Elmsford, New York, 10523-1544.

71. In 1991, Dynax Corporation (f/k/a Daikin-TLIM Co., Ltd.) entered the AFFF business, quickly becoming a leading global producer of fluorosurfactants and fluorochemical foam stabilizers used in firefighting foam agents.

72. Upon information and belief, at all times relevant to the present litigation, Dynax designed, manufactured and sold AFFF and/or PFAS components in AFFF that was used at March ARB.

73. Defendant BASF Corporation, ("BASF"), is a corporation organized and existing under the laws of Delaware, having a principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932.

74. On information and belief, BASF is the largest affiliate of BASF SE and the second largest producer and marketer of chemicals and related products in North America.

75. On information and belief, BASF Corporation is the successor in interest to Ciba-Geigy, Inc., Ciba Specialty Chemicals Company, and Ciba, Inc., Swiss specialty chemicals companies.

76. Ciba-Geigy, Inc., Ciba Specialty Chemicals Company, and Ciba, Inc. manufactured and sold PFAS or PFAS constituents for use in AFFF that was used at March ARB.

77. Defendant ChemDesign Products, Inc. is a corporation organized and existing under the laws of Texas and having a principal place of business at 2 Stanton Street, Marinette, Wisconsin 54143.

78. ChemDesign Products manufactured PFAS or PFAS constituents for Tyco and Chemguard to use in AFFF, including AFFF that was used at March ARB.

79. Defendant Arkema Inc. ("Arkema") is a corporation organized and existing under the laws of Pennsylvania, having a principal place of business at 900 First Avenue, King of Prussia, PA 19406.

80. Arkema develops specialty chemicals and fluoropolymers.

81. Arkema is a successor in interest to Elf Atochem North America and Atofina Chemicals Inc.

82. Arkema, Elf Atochem, and/or Atofina Chemicals manufactured and sold PFAS and/or PFAS components contained in AFFF that was used at March ARB.

83. Defendant AGC Chemicals Americas Inc. ("AGC Americas") is a corporation organized and existing under the laws of Delaware, having a principal place of business in 55 East Uwchlan Avenue, Suite 201, Exton, PA 19341. AGC Americas operates throughout the United States, manufacturing glass, electronic displays and chemical products, including resins, water and oil repellants, greenhouse films, silica additives, and various fluorointermediates.

84. AGC Americas manufactured and sold PFAS and/or PFAS components contained in AFFF that was used at March ARB.

85. Defendant Clariant Corporation ("Clariant") is a corporation organized and existing under the laws of New York, having a principal place of business at 4000 Monroe Road, Charlotte, North Carolina 28205.

86. Upon information and belief, Clariant was formerly known as Sandoz Chemicals Corporation and as Sodyeco, Inc. Upon information and belief, Clariant is the successor-in-interest to the specialty chemicals business of Sandoz Chemical Corporation. On information and belief, Sandoz spun off its specialty chemicals business to form Clariant in 1995.

87. Clariant, Sandoz Chemicals and/or Sodyeco manufactured and sold PFAS and/or PFAS components contained in AFFF that was used at March ARB.

88. Defendant Amerex Corporation ("Amerex") is a corporation organized and existing under the laws of the State of Alabama, with its principal place of business located at 7595 Gadsden Highway, Trussville, AL 35173.

89. Defendant Amerex is a manufacturer of firefighting products. Beginning in 1971, it was

a manufacturer of hand portable and wheeled extinguishers for commercial and industrial applications.

90. In 2011, Amerex acquired Solberg Scandinavian AS, one of the largest manufacturers of AFFF products in Europe.

91. On information and belief, beginning in 2011, Amerex designed, manufactured, marketed, sold, and distributed AFFF containing PFAS, including but not limited to PFOA and PFOS, that was used at March ARB.

92. Defendant Deepwater Chemicals, Inc. ("Deepwater") is a corporation organized under the laws of Delaware, with its principal place of business located at 196122 E County Road 40, Woodward, OK, 73801.

93. On information and belief, Deepwater Chemicals designed, manufactured, marketed, sold, and distributed fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products that were used at March ARB.

94. Defendant Archroma Management LLC ("Archroma") is a foreign corporation organized and existing under the laws of Switzerland, with its principal place of business at Neuhofstrasse 11, 4153 Reinach, Basel-Land, Switzerland.

95. On information and belief, Archroma was formed in 2013 when Clariant Corporation divested its textile chemicals, paper specialties, and emulsions business to SK Capital Partners.

96. On information and belief, Archroma designed, manufactured, marketed, sold, and distributed PFAS containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products that were used at March ARB.

97. Defendant Chemicals, Inc. ("Chemicals, Inc.") is a corporation organized and existing under the laws of Texas, with its principal place of business located at 12321 Hatcherville, Baytown, TX 77520.

98. On information and belief, Chemicals, Inc. supplied PFAS containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products that were used at March ARB.

99. Defendant Nation Ford Chemical Co. ("Nation Ford") is a corporation organized and existing under the laws of South Carolina, with its principal place of business located at 2300 Banks

Street, Fort Mill, SC 29715.

100. On information and belief, Nation Ford supplied PFAS containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products that were used at March ARB.

**Jurisdiction & Venue**

101. This Court, as a court of general jurisdiction, has subject-matter jurisdiction over this unlimited civil case because the amount in controversy exceeds $25,000.

102. This Court has general personal jurisdiction over each Defendant. Despite each Defendant's status as a foreign corporation, each defendant conducts business in the state of California and is subject to this Court's personal jurisdiction.

103. Venue is proper in this Court because March ARB, Western Water, and the contaminated groundwater at issue, are all located in Riverside County, California and the harms caused by Defendants and suffered by Plaintiff occurred in Riverside County, California. (Cal. Civ. Pro. §395(a), §395.5.)

**Specific Allegations**

104. PFAS are synthetic carbon chain compounds that contain large amounts of the element fluorine. As used in this Complaint, the term "PFAS" includes all PFAS and their precursors, derivatives, and/or salts that have been or may be detected in, or that are threatening, Plaintiff's water supplies and property, including *inter alia*, PFOA, and PFOS.

105. PFAS are used in and present in the firefighting foam known as "aqueous film forming foam" ("AFFF").

106. AFFF, developed in 1960's as an alternative firefighting foam, is water-based and used to extinguish fires that involve petroleum or other flammable liquid because PFAS resist heat, oil, grease, and water.

107. PFAS chemicals do not occur naturally. Thus, PFAS found in the environment or humans, including those in Plaintiff's water supply, are attributable to human activity.

108. 3M's AFFF, which is produced through a process developed by 3M called electrochemical fluorination ("ECF"), contains PFAS such as PFOS. Other formulations of the foam

purchased by the Department of Defense, manufactured by Defendant Tyco and other Defendant manufacturers are synthesized through telomerization, and contain PFAS including PFOA. Products made from both processes include formulations containing chemicals that can break down into other PFAS.

109. The Manufacturers each produced, manufactured, distributed, and/or sold AFFF containing PFAS, among other chemicals, to the Department of Defense, and Manufacturers sold and distributed AFFF that was used at March ARB.

110. In 1969, the United States Department of Defense issued Military Specification MIL-F-24385 for AFFF. For an AFFF manufacturer to sell its AFFF to the Air Force, it was required to meet MIL-F-24385. MIL-F-24385 established "the requirements for [AFFF] liquid concentrate fire extinguishing agents consisting of fluorocarbon surfactants and other compounds as required to conform to the requirements specified hereafter."

111. If the Department of Defense found that a manufacturer's product satisfied MIL-F-24385 performance expectations, the Department placed the product on the Department of Defense Qualified Product Listing.

112. In MIL-F-24385, the Department of Defense required that "the material shall have no adverse effect on the health of personnel when used for its intended purpose." This provision remained a part of the specification throughout the time Manufacturers sold AFFF products to the United States.

113. Manufacturers chose to include PFOS and PFOA as ingredients in the AFFF they sold and delivered to the United States pursuant to MIL-F-24385.

114. The inclusion of PFOA and PFOS in AFFF sold to the Air Force violated the MIL-F-24385 specification that "the material shall have no adverse effect on the health of personnel when used for its intended purpose."

115. The Manufacturers sold and delivered AFFF to the Air Force for use on its bases, including at March ARB. The Manufacturers knew or should have known that the AFFF they sold and delivered to the United States Department of Defense, including the Air Force, would adversely affect the health of personnel when used for its intended purpose and did not meet the specifications of MIL-F-24385.

116. Manufacturers knew or should have known that their harmful and defective AFFF products would be used for various purposes on Air Force bases, including, but not limited to, training for firefighting, testing firefighting equipment, actual firefighting, and use in hangar sprinkler fire suppressant systems, that would cause the AFFF to drain into the ground and eventually pollute or contaminate the groundwater beneath the bases and eventually migrate into the Plaintiff's water supplies.

## I. <u>Manufacturers Failed to Provide Notice of AFFF Toxicity.</u>

117. Upon information and belief, Manufacturers provided AFFF instructions, labels, and material safety data sheets, which, at least at significant times, did not fully describe the health and environmental hazards of AFFF that Manufacturers knew or should have known.

118. Upon information and belief, Manufacturers knew of these health and environmental hazards for many years prior to disclosing the information to the public.

119. 3M knew as early as the mid-1950s that PFAS bioaccumulate in humans and animals. 3M first shared its concerns with the U.S. Environmental Protection Agency ("EPA") in the late 1990s. In May 1998, a former 3M employee submitted a report to the EPA stating, "3M chose to report simply that PFOS had been found in the blood of animals, which is true but omits the most significant information."[2] A 1956 study at Stanford University concluded that the PFAS manufactured by 3M bind to proteins in blood.[3]

120. By the early 1960s, 3M understood that PFAS are stable, persist in the environment, and do not degrade. One 3M employee wrote in 1964: "This chemical's stability also extends itself to all types of biological processes; there are no known biological organisms that are able to attack its carbon-fluorine bond in a fluorocarbon."[4] Thus, 3M knew by the mid-1960s that its fluorosurfactants were immune to chemical and biological degradation in soils and groundwater.

121. In 1970, the authors of a scientific journal article observed after conducting tests on a 3M

---

[2] Letter from R. Purdy, Mar. 28, 1999, available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1001.pdf.
[3] Perfluorooctanoic Acid Interactions with Human Serum Albumin, available at https://static.ewg.org/reports/2019/pfatimeline/1956_Stanford.pdf?_ga=2.59569645.1994765108.1678715813-813372143.1678715813.
[4] Bryce, H.G., Industrial and Utilitarian Aspects of Fluorine Chemistry (1964), available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX3022.pdf.

product containing PFAS that the product was "highly derogatory to marine life and the entire test program had to be abandoned to avoid severe local stream pollution."

122. Studies undertaken by 3M in the 1970s demonstrated that PFAS were even "more toxic than was previously believed."

123. A 1978 study by 3M on PFAS confirmed that "these chemicals are likely to persist in the environment for extended periods unaltered by microbial catabolism."[5]

124. In 1979, a 3M scientist recognized that PFAS posed a cancer risk because they are "known to persist for a long time in the body and thereby give long-term chronic exposure."

125. In the 1970s, Manufacturers began making AFFF with PFAS other than PFOS and PFOA, including shorter carbon chain PFAS. Upon information and belief, those other PFAS are also highly soluble, persistent, bioaccumulative, and toxic to humans.

126. In the 1970s, 3M began a major program to review personnel handling of fluorochemicals, which confirmed that fluorochemicals could bioaccumulate.

127. The potential loss of tremendous profits from PFAS drove 3M to engage in a deliberate campaign to influence the science relating to PFAS and, according to internal company documents, to conduct scientific "research" that it could use to mount "[d]efensive [b]arriers to [l]itigation."

128. A key priority of an internal 3M committee was to "[c]ommand the science" concerning the "exposure, analytical, fate, effects, human health and ecological" risks posed by PFAS and for 3M to provide "[s]elective funding of outside research through 3M 'grant' money."

129. In exchange for providing grant money to friendly researchers, 3M obtained the right to review and edit the drafts of papers on PFAS and sought control over when and whether these papers were published at all.

130. Under pressure from the EPA, on May 16, 2000, 3M announced it would phase out production of two synthetic chemicals, PFOS and PFOA, that it had developed more than 50 years earlier.[6] 3M, who was the predominant manufacturer of AFFF, ceased production of PFOS-based AFFF

---

[5] Technical Report Summary re : Fate of Fluorochemicals in the Environment, Biodegradation Studies of Fluorocarbons - II, Jan. 1, 1978, available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1153.pdf.

[6] 3M press release, "3M Phasing Out Some Of Its Specialty Materials", May 16, 2000, http://www.chemicalindustryarchives.org/dirtysecrets/scotchgard/pdfs/226-0641.pdf#page=1

in 2002.

131. Also on May 16, 2000, the EPA wrote an internal memo stating the data 3M supplied to the EPA indicated PFAS are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues, and could potentially pose a risk to human health and the environment over the long term.

132. In contrast, 3M's news release insisted that "[their] products are safe," while extolling their "principles of responsible environmental management" as driving the cessation of production.[7]

133. Also in the 1970s, Manufacturers began making AFFF with PFAS other than PFOS and PFOA, including shorter carbon chain PFAS. Upon information and belief, those other PFAS are also highly soluble, persistent, bioaccumulative, and toxic to humans.

134. Upon information and belief, Manufacturers sold and delivered those other PFAS, PFOS and PFOA, to the Air Force, who stored, used, released, discharged, and disposed of them at March ARB, thereby contaminating Plaintiff's wastewater treatment systems. For instance, in 2018 PFOS and PFOA were detected in concentrations of 747ng/l (747 ppt) in the groundwater under the Recycling Facility and the openly exposed sludge drying beds adjoining the Recycling Facility.[8]

135. The concentrations of PFAS found in Plaintiff's wastewater treatment facilities have been caused by releases of Manufacturers' AFFF to the environment.

136. As was reasonably foreseeable to Manufacturers, the use of AFFF for training, fire response, and other purposes at March ARB resulted in discharges of AFFF to open ground and sewer collection systems.

137. As was reasonably foreseeable to Manufacturers, the chemical components of AFFF, including PFAS, migrated into and through the soil and groundwater and from there migrated to and contaminated soil and groundwater on or beneath property owned and operated by the Plaintiff, and contaminated the wastewater treatment systems. The PFAS contamination is therefore directly caused by Manufacturers' production, manufacture, distribution, and/or sale of AFFF.

[7] 3M press release, "3M Phasing Out Some Of Its Specialty Materials", May 16, 2000, http://www.chemicalindustryarchives.org/dirtysecrets/scotchgard/pdfs/226-0641.pdf#page=1.

[8] "California Takes on PFAS Contamination While the Military is a Primary Source of the Pollution," CIVILIAN EXPOSURE, https://www.civilianexposure.org/california-takes-on-pfas-contamination-while-the-military-is-a-primary-source-of-the-pollution/.

138. It was and is reasonably foreseeable to the Manufacturers that Plaintiff's property interests would be damaged by contamination resulting from releases of AFFF and its chemical components at March ARB.

139. Manufacturers knowingly produced, manufactured, distributed, and/or sold a dangerous and defective product, acted with malice by consciously disregarding public health and intentionally concealing the risks associated with PFAS, failed to provide sufficient warnings to protect members of the public, such as Plaintiff, and failed to recall their products when they took them off the market and/or knew them to present a hazard to human health.

140. Upon information and belief, non-PFAS based products were available for fire training and other pertinent uses that would not have led to contamination of groundwater and Plaintiff's property.

141. Upon information and belief, Manufacturers control a substantial share of the market in the United States for AFFF containing PFAS and are jointly responsible for the contamination of the Regional Plant and Recycling Facility and for causing the damages and injuries that Plaintiff has and will suffer.

142. As a direct and proximate result of the contaminated groundwater near March ARB, Plaintiff has suffered, and will continue to suffer, damages.

## II. <u>The Use, Storage, Release, Discharge and Disposal of PFAS from AFFF Firefighting Foam at March ARB has Contaminated Plaintiff's Wastewater Supply.</u>

143. Presently, Western Water treats three million gallons of wastewater per day at the Recycling Facility.

144. Beginning in 1978, Site 15 was used as a fire protection training area.[9] AFFF use at March ARB was documented specifically at Site 15.[10]

145. Site 15 was situated on the southeast of runway 12-30, one of the runways on March ARB, and was constructed by placing an under-drain systems and gravel over a clay liner.[11]

---

[9] *Id.*

[10] 5-Year Review Report for Former March Air Force Base and March Air Reserve Based, Riverside County, California, September 2003, https://semspub.epa.gov/work/HQ/178946.pdf.

[11] *Id.*

146. The site's drainage system was used to transport firefighting water, AFFF, and residual fuel from training exercises to a water holding pond situated adjacent to Site 15 which was initially unlined.[12]

147. From 1978 to the temporary closure of Site 15 in 1993, approximately 6,000 gallons of contaminated jet fuel was burned there every year as a part of training exercises.[13]

148. Upon information and belief, the United States Air Force continues to store PFAS contaminated water on March ARB and the resulting harm to Plaintiff is ongoing.

149. As additional information becomes available regarding the United States' handling, release, discharge, and disposal of PFAS at March ARB, additional locations where AFFF was used, stored, discharged, and/or disposed of may be discovered.

**III. Release, Discharge, and Disposal of PFAS, including PFOA and PFOS, is Contaminating the Recycling Facility and the Regional Plant, and Threatening Human Health.**

150. In 2018, PFOS and PFOA concentrations were detected in concentrations of 747ng/l (747 ppt) in the groundwater under the Western Water Recycling Facility, and the openly exposed sludge drying beds adjoining the Recycling Facility.[14] PFOS was found in the sludge in the concentrations of 6.32 J µg/kg.[15]

151. This sludge is transported to landfills on March ARB and disposed of off-site at undisclosed locations where the PFAS-contaminated sludge seeps into the groundwater.[16]

152. The United States has not yet analyzed the extent of PFAS contamination at numerous other locations where AFFF was used and escaped into the environment, including, but not limited to, Site 15, Building 423, and other areas along the surface and groundwater pathways from March ARB to the Plaintiff's wastewater treatment facilities. Plaintiff reserves the right to incorporate additional information regarding PFAS contamination in soil and water as it is discovered.

[12] *Id.*
[13] *Id.*
[14] "California Takes on PFAS Contamination While the Military is a Primary Source of the Pollution," CIVILIAN EXPOSURE, https://www.civilianexposure.org/california-takes-on-pfas-contamination-while-the-military-is-a-primary-source-of-the-pollution/.
[15] *Id.*
[16] *Id.*

**A. PFOA and PFOS and Their Risk to Public Health.**

153. PFAS are chemical compounds containing fluorine and carbon. These substances have been used for decades in the manufacture of, among other things, household and commercial products that resist heat, stains, oil, and water. These substances are not naturally occurring and must be manufactured.

154. PFOA and PFOS easily dissolve in water. Thus, PFOA and PFOS are easily spread in the natural environment. PFOA and PFOS also readily contaminate soils and leach from the soil into groundwater, where they can travel significant distances.

155. Humans may absorb PFAS from drinking water, and PFAS accumulate primarily in the bloodstream, kidneys and liver.

156. PFAS are extremely persistent and bioaccumulate, or build up, in the human body. Even short-term exposure results in a body burden that persists for years and can increase with additional exposure. The EPA's Health Advisories have identified several health risks associated with exposure to PFAS.

157. The EPA projects that PFOS has a half-life of 5.4 years, PFOA has a half-life of 2.3 – 3.8 years, and PFHxS has a half-life of 8.5 years, in humans.

158. A half-life is the amount of time it takes for 50% of the contaminant to leave the body. Due to the long half-lives of PFAS like PFOS and PFOA, the EPA expects that "it can reasonably be anticipated that continued exposure could increase body burdens to levels that would result in adverse outcomes."[17]

159. Studies show associations between increased PFOA and PFOS levels in blood and an increased risk of several health effects, including high cholesterol levels, changes in thyroid hormone, ulcerative colitis (autoimmune disease), pre-eclampsia (a complication of pregnancy that includes high blood pressure), kidney cancer, and testicular cancer.

160. The EPA also classified PFOA and PFOS as having suggestive evidence of carcinogenic potential in humans.[18]

---

[17] EPA, Long-Chain Perfluorinated Chemicals (PFCs) Action Plan, pp. 1, 8-9, December 30, 2009.
[18] EPA, Health Effects Support Document for Perfluorooctanoic Acid (PFOA), p. 3-159, May 2016; EPA, Health Effects Support Document for Perfluorooctane Sulfonate (PFOS), p. 3-114, May 2016.

161. The EPA cited reports from the Organization for Economic Co-operation and Development ("OECD") in the May 2016 Health Advisories. The OECD is an international intergovernmental organization that meets, discusses issues of concern, and works to respond to international problems.

162. According to a published OECD Report, for mammalian species, PFOA and its salts have been found to cause cancer in rats and adverse effects on the immune system in mice. Additionally, PFOA and its salts can lead to reproductive or developmental toxicity in rodents at moderate levels of exposure, and moderate to high systemic toxicity in rodents and monkeys following long-term exposure by the oral route.[19]

163. The OECD also concluded in a Hazard Assessment that PFOS is persistent, bioaccumulative and toxic to mammalian species.[20] The EPA also cited findings from a C8 Science Panel and Health Project in the May 2016 Health Advisory for PFOA.

164. The C8 Science Panel was formed out of a class action settlement related to PFOA contamination of groundwater from a manufacturing facility in West Virginia and consisted of three epidemiologists, whose goal was to assess the links between PFOA and several diseases.

165. Between 2005 and 2013, the C8 Science Panel carried out a series of exposure and health studies, gathering information through questionnaires and blood samples from the individuals who drank PFOA-contaminated water and reviewing previously published studies.

166. The C8 Health Project is the largest study evaluating human exposure and health endpoints for PFOA;, including more than 65,000 people in mid-Ohio Valley communities who were exposed to PFOA for a year or longer.

167. The C8 Science Panel released reports showing probable links between exposure to PFOA and six diseases: [1] high cholesterol, [2] ulcerative colitis, [3] thyroid disease, [4] testicular cancer, [5] kidney cancer, and [6] pregnancy-induced hypertension.

168. The U.S. Agency for Toxic Substances and Disease Registry ("ATSDR") states in its 2018 draft Toxicological Profile that studies suggest associations between PFOA and PFOS exposure

[19] OECD, Report of an OECD Workshop on Perfluorocarboxylic Acids (PFCAs) and Precursors, p. 21, June 18, 2007.
[20] OECD, Hazard Assessment of Perfluorooctane Sulfonate (PFOS) and Its Salts, p. 5, November 21, 2002.

and liver damage, pregnancy-induced hypertension, increased cholesterol, increased risk of thyroid disease, increased risk of asthma, increased risk of decreased fertility, low birth weight and increases in testicular and kidney cancers.

169. California has listed PFOA and PFOS on its Proposition 65 list as a chemical known to cause reproductive toxicity under the Safe Drinking Water and Toxic Enforcement Act of 1986.[21]

170. Notwithstanding the foregoing actions and determinations by EPA and the State of California, neither PFOA nor PFOS, nor other PFAS, have been listed as, or otherwise determined to be, hazardous waste regulated by the Resource Conservation and Recovery Act ("RCRA"), the principal federal law governing the disposal of solid waste and hazardous waste. However, in February of 2024, the EPA proposed changes to RCRA by adding nine per- and polyfluoroalkyl compounds, their salts, and their structural isomer, to this list of hazardous constituents.[22] Among the nine PFAS listed are:

a. Perfluorooctanoic acid,

b. Perfluorooctanesulfonic acid,

c. Perfluorobutanesulfonic acid,

d. Hexafluoropropylene oxide-dimer acid,

e. Perfluorononanoic acid,

f. Perfluorohexanesulfonic acid,

g. Perfluorodecanoic acid,

h. Perfluorohexanoic acid, and

i. Perfluorobutanoic acid.

171. The EPA welcomed comment on this proposal through April 8, 2024.

172. As it stands, the mandatory directives requiring Air Force to treat AFFF containing PFAS as hazardous waste are internal requirements, not RCRA compliance obligations.

---

[21] California Office of Environmental Health Hazard Assessment, *Chemicals Listed Effective Nov. 10, 2017 as Known to the State of California to Cause Reproductive Toxicity: Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS)*, Nov. 9, 2017, *available at* https://oehha.ca.gov/proposition-65/crnr/chemicals-listed-effective-november-10-2017-known-statecalifornia-cause.

[22] United States Environmental Protection Agency, *Proposal to List Nine Per- and Polyfluoroalkyl Compounds as Resource Conservation and Recovery Act Hazardous Constituents*, February 8, 2024, *available at* https://www.epa.gov/hw/proposal-list-nine-and-polyfluoroalkyl-compounds-resource-conservation-and-recovery-act.

173. Upon information and belief, Defendants knew or should reasonably have known about the health effects from PFAS, discussed above, at the time they developed, designed, produced, manufactured, marketed, distributed, supplied, or used PFAS-based AFFF.

**B. PFAS, including PFOA and PFOS, Threaten the Environment.**

174. PFAS are extremely persistent in the environment because they are chemically and biologically stable and are resistant to environmental degradation.

175. The EPA projects that PFOS has a 41 year or greater half-life in water, and PFOA has a half-life of over 92 years in water.

176. Additionally, "PFOA and PFOS are considered to be resistant to degradation in soil."[23]

177. In addition to being particularly mobile in soil and water, PFAS also are readily absorbed into groundwater and can migrate across long distances.

178. Even non-human receptors exposed to a PFAS-contaminated environment are at significant risk of harm.

179. PFOA is persistent and can cause adverse effects in laboratory animals, including cancer and developmental and systemic toxicity. Meanwhile, PFOS is persistent, bioaccumulative and toxic to mammalian species and is linked to developmental, reproductive, and systemic toxicity.

180. PFOA and PFOS are also linked to:

a. immune system impacts on certain animal species (which are often used as indicators of the overall health of an ecosystem);

b. elevated mortality in unexposed progeny of freshwater macro-invertebrates with exposure in the parental generation;

c. disruption of the endocrine system in wildlife; and

d. liver toxicity in animals.

181. PFOA is also readily taken up by plants, including wild plants, as well as crops grown on contaminated soil, and bioaccumulates in the food chain.

182. These impacts impair Plaintiff's use of recycled wastewater for various outdoor purposes such as general municipal landscaping, as well as maintaining parks, schools, golf courses,

[23] EPA, Long-Chain Perfluorinated Chemicals (PFCs) Action Plan, p. 1, December 30, 2009.

groves, nurseries, and cemeteries in Riverside County.

183. Further, since PFOA and PFOS are not the only PFAS in the environment, mixtures of PFAS raise the likelihood of additive and synergistic impacts on non-human receptors. It is likely that one or more other PFAS possess similar characteristics and pose similar threats of adverse health effects as set forth above for PFOA and PFOS.

184. Upon information and belief, Defendants knew or should reasonably have known about the environmental effects from PFAS, discussed above, at the time they developed, designed, produced, manufactured, marketed, distributed, supplied, or used PFAS-based AFFF.

**C. The Threats from PFAS are Ongoing.**

185. The PFAS contamination caused by Defendants is not contained and continues to spread into Plaintiff's property and wastewater treatment supplies.

186. If the contamination occurring at Plaintiff's Recycling Facility and Regional Plant are not remediated, PFAS contamination will continue to impact Plaintiff's property far into the future because PFAS resist degradation and are persistent and mobile in water and soil.

**IV. Plaintiff Has Been Damaged by Defendants Actions**

187. The PFAS contamination prevents Plaintiff from fully utilizing their property, including the wastewater that migrates to its Recycling Facility and/or Regional Plant.

188. PFAS can enter wastewater through industrial processes, everyday use of commercial products, or when PFAS-containing products are discarded in waste disposal sites such as landfills and compost sites.

189. Here, PFAS entered the Plaintiff's wastewater system and facilities through AFFF discharge from a sewage drain lateral or indirectly through groundwater infiltration at March ARB.

190. Wastewater treatment facilities, including Recycling Facility, are not designed to remove PFAS and ultimately may end up releasing PFAS into the environment in a way that can contaminate surface water, groundwater, drinking water, and the food supply.

191. Plaintiff treats wastewater and provides recycled wastewater for public and private purposes throughout Riverside County.

192. PFAS may also migrate to a wastewater plant and flow out as effluent and be absorbed

to biosolids (sludge) to be potentially spread as fertilizer or for other agricultural uses.

193. The PFAS contamination of Plaintiff's wastewater, caused by use and discharge of Manufacturers' AFFF products at March ARB, has and will continue to disrupt Plaintiff's production of recycled water and biosolids.

194. As a result of the contamination caused by Manufacturers' AFFF products, Plaintiff has and will incur damages related to PFOA and PFOS contamination in an amount to be proved at trial.

195. In response to PFAS contamination of its wastewater and facilities, Western Water has and will begin replacing key infrastructure through various projects including a Pilot Treatment System at Recycling Facility (estimated at $3.0 million) and repairing and sealing priority sewer lines (estimated at $3.45 million).

196. PFAS are damaging, and will continue to damage, Western Water's wastewater supply and facilities.

## FIRST CAUSE OF ACTION

## NUISANCE

(By Plaintiff Against All Defendants)

197. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

198. Defendants manufacture, sale, and/or distribution of AFFF, and its toxic PFAS components, constituted intentional, negligent, and/or unreasonably dangerous activity causing the unreasonable and substantial interference with the use of Plaintiff's wastewater treatment facility, and property rights and interests.

199. Defendants knew and/or should have reasonably foreseen that the invasion of the Plaintiff's and its customer's property interests, including its wastewater, groundwater, wastewater treatment plant, pipes, other fixtures and biosolids were substantially certain to result from the use of the AFFF as Defendants intended, including by March ARB, given the toxic properties of the PFAS components in AFFF. Defendants participated to a substantial extent in the carrying on of the nuisance by its actions described above.

200. The unreasonable and substantial interference with the use of Plaintiff's property rights

and interests includes, but is not limited to, PFAS contamination of groundwater, wastewater, wastewater treatment facility, sewer systems, piping, other fixtures, and biosolids on Plaintiff's property caused by Defendants' AFFF.

201. Plaintiff has also suffered unreasonable and substantial interference with its property rights and interests because PFAS contained in Defendants' AFFF has contaminated the Water District's wastewater supply and groundwater and as result Plaintiff has been required to remediate the contamination and ensure that it can process wastewater in compliance with regulatory requirements and thereby incurred significant financial losses and damages.

202. Defendants' manufacture, sale, and/or distribution of AFFF, and its toxic PFAS components, constitutes a pattern of continuous and ongoing tortious conduct.

203. PFAS from AFFF continues to contaminate Plaintiff's properties and continue to migrate to Plaintiff's property.

204. As a direct result of Defendants' creation of a nuisance, the wastewater treated by Plaintiff pursuant to their property rights and interests have been, and continue to be, contaminated with PFAS from Defendants' AFFF.

205. Defendants' creation of a nuisance caused, is causing, and will continue to cause Plaintiff and its citizens substantial and unreasonable interference with its property rights.

206. Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the rights and property of Plaintiff.

207. As a result of Defendants' tortious conduct and resulting contamination of Plaintiff's groundwater, wastewater, wastewater treatment plant, piping, other fixtures, biosolids, and other property, by the toxic PFAS components of the Defendants' AFFF, the Plaintiff has incurred and will incur losses.

## SECOND CAUSE OF ACTION

## NEGLIGENCE

## (By Plaintiff Against All Defendants)

208. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

209. Defendants had a duty to exercise reasonable care in the development, design, production, manufacture, marketing, distribution, supply, sale, or use of AFFF, including a duty to avoid contaminating the environment and water supplies.

210. Defendants had a duty to exercise reasonable care to avoid harming those who would foreseeably come into contact with AFFF's toxic chemicals and be directly exposed to its hazardous properties.

211. Defendants knew or should have known that the production, manufacture, distribution, sale, supply, and use of AFFF containing PFAS was hazardous to human health and the environment.

212. Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to produce, manufacture, distribute, sell, supply, and use AFFF containing PFAS because it was reasonably foreseeable that the chemical's toxic properties would migrate into the environment, including the environment at Air Force bases such as March ARB, and contaminate groundwater used as public and agricultural water supply.

213. Defendants' knowledge of the dangerous and hazardous properties of the AFFF, established the duty to warn of the hazards of consuming water containing PFAS.

214. Plaintiff was a foreseeable victim of the harm caused by the chemical components of Defendants' AFFF.

215. Defendants breached their duty when they negligently designed, engineered, developed, produced, fabricated and, tested AFFF and PFAS; negligently, produced, manufactured, distributed, and/or sold AFFF; negligently provided inadequate warnings and instructions; failed to exercise reasonable care in preventing the AFFF and its chemical components from presenting an unreasonable risk of harm to the health of individuals who come in contact with the product, and to prevent contamination of public and agricultural water, including Plaintiff's water supplies.

216. As a direct and proximate result of Defendants' breaches of their legal duties, the groundwater beneath and around March ARB and wastewater flowing to Plaintiff's wastewater treatment facilities, has been, and continues to be, contaminated with PFAS.

217. As a direct and proximate result of Defendants' negligent, reckless, and/or intentional acts and omissions alleged herein, Plaintiff's wastewater treatment facilities have been contaminated

with PFAS.

218. As a result of Defendant's conduct and the resulting contamination of the groundwater and wastewater of March ARB that migrates to Plaintiff's Recycling Facility, Plaintiff has or will incur costs to [1] investigate, sample, test, assess, and report on the extent of PFAS contamination, including wastewater, biosolids, and other related products such as reuse water, resulting from AFFF products; [2] install and maintain filtration systems to assess and evaluate PFAS contamination resulting from AFFF products; [3] treat and remediate PFAS-contaminated wastewater, biosolids, reuse water (and other products), and wastewater infrastructure resulting from AFFF products; [4] upgrade and/or modify infrastructure, including, but not limited to, design, construction, operation, and maintenance of systems related to PFAS contamination from AFFF products; [5] change biosolids reuse/disposal practices stemming from PFAS contamination from AFFF products; and [6] other response costs. Additionally, Plaintiff has and/or will incur lost profits and opportunities associated with biosolids and reuse water (among other products) due to contamination with PFAS resulting from AFFF products.

219. As a result of the ongoing contamination, Plaintiff has suffered, continues to suffer, and will suffer direct and indirect harms affecting their operation as a special water district, and their ability to provide water supply, wastewater disposal, and recycled water services to nearly one million customers across 527 square miles in western Riverside County.

220. Defendants' negligent design, engineering, development, production, fabrication, testing, and inadequate warnings and instructions related to AFFF constitute a pattern of continuous and ongoing tortious conduct.

221. Upon information and belief, Defendants have and continue to engage in discrete acts of negligent design, engineering, development, fabrication, testing, warnings, and instructions to the date of this Complaint.

222. Upon information and belief, Defendants have not recalled their AFFF product as of the date of this Complaint.

///

///

///

**THIRD CAUSE OF ACTION**

**DEFECTIVE PRODUCT – FAILURE TO WARN**

**(By Plaintiff Against All Defendants)**

223. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if they were fully set forth herein.

224. At all times relevant, Defendants were in the business of developing, designing, producing, manufacturing, marketing, distributing, supplying, selling, or using AFFF containing PFAS.

225. As manufacturers, distributors, and/or sellers of AFFF, a commercial product, the Defendants had a duty to provide adequate warnings about the risks of injury posed by their products and complete instructions to safe-handling practices.

226. Defendants knew or should have known that the foreseeable storage, use, release, and disposal of the AFFF that they developed, designed, produced, manufactured, marketed, distributed, supplied, sold, or used by the Air Force, including at March ARB, would foreseeably enter the Plaintiff's groundwater supplies, persist there indefinitely, and cause risks to human health, the environment, and harm to property.

227. Defendants consciously disregarded the dangerous properties of the AFFF containing PFAS and maliciously entered their AFFF into the stream of commerce even though Defendants knew or should have known of the public health and environmental risks associated with AFFF at the time of AFFF's development, design, production, manufacture, marketing, distribution, supply, sale, or use by users such as March ARB.

228. Defendants knew or reasonably should have known that users of AFFF such as the Air Force and March ARB would not realize the dangers and potential harm of PFAS contamination associated with AFFF.

229. Upon information and belief, at all relevant times Defendants failed to provide sufficient warnings and instructions to users of AFFF, including the Air Force, that the use and release of AFFF into the environment would result in groundwater contamination that migrates into Plaintiff's treatment facilities, such as the Recycling Facility, and negatively impacts the production of biosolids and other products.

230. Upon information and belief, at all relevant times Defendants failed to provide adequate warnings and instructions to the users of the dangers to human health and the environment of their AFFF that ultimately contaminated the groundwater and soil.

231. Defendants' negligent manufacture, distribution, and/or sale of AFFF, and their intentional concealment and failure to warn, caused, is causing, and will cause damage to Plaintiff's property interests due to the presence of PFAS in their water supply and treatment facilities.

232. Adequate warnings and instructions would have reduced or avoided the foreseeable risks of harm posed by the use and release the AFFF.

233. Had Defendants provided adequate warnings, the Air Force would not have used AFFF containing PFAS or would have taken measures to store, use, discharge, and dispose of AFFF so as to reduce or eliminate groundwater contamination by the components of AFFF.

234. As a result of Defendants' failure to warn against the likelihood of contamination from their AFFF, the groundwater and sewer pipeline connections and associated water supply infrastructure at March ARB have been contaminated with the chemical components of AFFF including PFAS.

235. As a direct and proximate result of Defendants' failure to warn of the environmental and health impacts caused by the toxic chemicals in their AFFF product and the release thereof, the groundwater and sewer pipelines at March ARB that migrate to Plaintiff's wastewater and recycling facilities became contaminated with PFAS, causing loss of Plaintiff's use and benefit of their appropriated water rights and the incurrence, or reasonably certain incurrence, of costs to treat the wastewater migrating from the March ARB to their facilities.

236. Defendants' failure to provide adequate warnings or instructions renders Defendants' AFFF a defective product.

237. As a result of Defendants' development, design, production, manufacture, marketing, distribution, supply, sale, and/or use of a defective product, Defendants are strictly liable for damages to the Plaintiff.

238. For several decades, Defendants acted with malice by consciously disregarding Plaintiff's water rights and acted with extreme indifference to public health by failing to warn consumers about the environmental and health risks associated with using AFFF.

239. As a result of Defendant's conduct and the resulting contamination of Plaintiff's wastewater treatment plants by the chemical components of the Defendants' AFFF, the Plaintiff has or will incur costs to [1] investigate, sample, test, assess, and report on the extent of PFAS contamination in wastewater, biosolids, and other related products such as reuse water, resulting from AFFF products; [2] install and maintain filtration systems to assess and evaluate PFAS contamination resulting from AFFF products; [3] treat and remediate PFAS-contaminated wastewater, biosolids, reuse water (and other products), and wastewater infrastructure resulting from AFFF products; [4] upgrade and/or modify infrastructure, including, but not limited to, design, construction, operation, and maintenance of systems related to PFAS contamination from AFFF products; [5] change biosolids reuse/disposal practices stemming from PFAS contamination from AFFF products; and [6] other response costs. Additionally, Plaintiff has and/or will incur lost profits and opportunities associated with biosolids and reuse water (among other products) due to contamination with PFAS resulting from AFFF products.

240. In addition, the Plaintiff has lost the value and marketability of their property and property rights, including appropriated water rights.

241. Defendants' failure to provide adequate warnings and instructions constitutes a pattern of continuous and ongoing tortious conduct.

242. Upon information and belief, Defendants have and continue to fail to provide adequate warnings and instructions as of the date of this Complaint.

243. Upon information and belief, Defendants have not recalled their AFFF product as of the date of this Complaint.

## FOURTH CAUSE OF ACTION

## DEFECTIVE PRODUCT – DESIGN DEFECT

## (By Plaintiff Against All Defendants)

244. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

245. At all times relevant, Defendants were in the business of developing, designing, producing, manufacturing, marketing, distributing, supplying, selling, or using AFFF containing PFAS.

246. Defendants owed a duty to all persons whom their products might foreseeably harm,

including Plaintiff, and a duty not to market any product which is unreasonably dangerous in design for its reasonably anticipated use.

247. It was foreseeable to Defendants that as a natural and probable consequence of ordinary use of the AFFF products that Defendants designed, manufactured, distributed, and sold, such products would reach groundwater, migrate, be washed into streams of water, and be discharged into sewers, like those owned by Plaintiff.

248. It was foreseeable that toxic chemicals from the AFFF that Defendants designed, manufactured, distributed, and/or sold would enter Plaintiff's water supplies and cause damage to their property interests, including Plaintiff's appropriated water rights.

249. Alternative designs and formulations of AFFF were available, technologically feasible and practical, and would have reduced or prevented the reasonably foreseeable risks of harm to Plaintiff.

250. Further, Defendants' design, formulation, manufacture, distribution, and/or sale of a products containing toxic chemicals that are readily mobile and persistent in the environment was unreasonably dangerous.

251. The AFFF manufactured, distributed, and/or sold by Defendants was designed defectively because the foreseeable risk of harm posed by the AFFF was unreasonably dangerous and the risk of harm could have been reduced or eliminated by the adoption of a reasonable alternative design.

252. Defendants' products were defective at the time of manufacture, distribution, and/or sale, and thus at the time the AFFF product left Defendants' control.

253. As a result of Defendants' manufacture, distribution, and/or sale of a defectively designed product, the collection pipelines from residential and non-residential sites at March ARB became contaminated with toxic PFAS and migrated to Recycling Facility, interrupting the production of recycled water and biosolids, thereby causing damage to Plaintiff.

254. Defendants' tortious acts and omissions resulted in the contamination of several residential and non-residential March ARB sewer collection pipelines, which migrate to Plaintiff's Recycling Facility to produce recycled water and biosolids, with toxic PFAS chemical components of

Defendants' AFFF products.

255. As a result of Defendants' design, formulation, manufacture, distribution, and/or sale of a defective product, Defendants are strictly liable in damages to the Plaintiff.

256. For several decades, Defendants acted with malice by consciously disregarding Plaintiff's water rights and acted with extreme indifference to public health by designing a defective product that would foreseeably harm the environmental and public health.

257. As a result of the contamination by the chemical components of the Defendants' AFFF, Plaintiff has or will incur costs to [1] investigate, sample, test, assess, and report on the extent of PFAS contamination, including wastewater, biosolids, and other related products such as reuse water, resulting from AFFF products; [2] install and maintain filtration systems to assess and evaluate PFAS contamination resulting from AFFF products; [3] treat and remediate PFAS-contaminated wastewater, biosolids, reuse water (and other products), and wastewater infrastructure resulting from AFFF products; [4] upgrade and/or modify infrastructure, including, but not limited to, design, construction, operation, and maintenance of systems related to PFAS contamination from AAFFF products; [5] change biosolids reuse/disposal practices stemming from PFAS contamination from AFFF products; and [6] other response costs. Additionally, Plaintiff has and/or will incur lost profits and opportunities associated with biosolids and reuse water (among other products) due to contamination with PFAS resulting from AFFF products.

258. In addition, the Plaintiff has lost the value and marketability of their property and property rights, including appropriated water rights.

259. Defendants' manufacture, distribution, and/or sale of AFFF, constitutes a pattern of continuous and ongoing tortious conduct.

260. Upon information and belief, Defendants have sold and continue to sell and distribute AFFF in a tortious manner as of the date of this Complaint.

261. Upon information and belief, Defendants have not recalled their AFFF product to the date of this Complaint.

**FIFTH CAUSE OF ACTION**

**PRIVATE NUISANCE**

**(By Plaintiff Against All Defendants)**

262. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

263. Defendants' manufacture, distribution, sale, supply, and marketing of AFFF was, and continues to be, a substantial interference to Plaintiff's right to the use and enjoyment of Plaintiff's property.

264. Defendants' manufacture, distribution, sale, supply, and marketing of AFFF was, and continues to be, a substantial factor in causing Plaintiff to suffer harm.

265. Defendants knew the unique and dangerous properties AFFF containing PFAS but failed to provide adequate warnings of or take other precautionary measures to mitigate those harms.

266. Defendants' manufacture, distribution, sale, supply, and marketing of AFFF foam containing PFAS constituted intentional, negligent, and/or unreasonably dangerous activity, which caused the unreasonable and substantial interference with the use and enjoyment of Plaintiff's property.

267. Each Defendant has caused, contributed to, and/or maintained such nuisance, and is a substantial contributor to such nuisance.

268. Defendants knew and/or should have reasonably foreseen that the invasion of the Plaintiff's property interests, including their water supplies, was substantially certain to result from the use of the AFFF as Defendants intended, including at March ARB, given, among other reasons, the chemical properties of AFFF.

269. Defendants unreasonably and substantially interfered with the use and enjoyment of Plaintiff's property interests through the contamination of groundwater and soil on Plaintiff's property with toxic chemicals manufactured, distributed, and/or sold by Defendants, including the source of Plaintiff's appropriated water rights and causing Plaintiff's need to obtain alternative sources of water and expense thereof.

270. Defendants' sale and distribution of AFFF, failure to recall AFFF products once the danger of its chemical components became known to Defendants and attempts to prevent the revelation

of the chemicals' dangers constitutes a pattern of continuous and ongoing tortious conduct.

271. Upon information and belief, Defendants have and continue to sell and distribute AFFF in a tortious manner to the date of this Complaint.

272. Upon information and belief, PFAS continue to migrate to and contaminate Plaintiff's properties. The continued migration and ongoing contamination of the groundwater supplies relied on by Plaintiff pursuant to their appropriated water rights is directly caused by the PFAS chemicals created distributed, and/or sold by Defendants sufficiently establishes a private nuisance.

273. At all relevant times, Plaintiff has never consented to the Defendants' conduct.

274. Defendants' conduct over the course of several decades sufficiently constitutes malice because of their conscious disregard of Plaintiff's rights and extreme indifference to public health.

275. As a result of the contamination by the chemical components of the Defendants' AFFF, Plaintiff has or will incur costs to [1] investigate, sample, test, assess, and report on the extent of PFAS contamination, including wastewater, biosolids, and other related products such as reuse water, resulting from AFFF products; [2] install and maintain of filtration systems to assess and evaluate PFAS contamination resulting from AFFF products; [3] treat and remediate PFAS-contaminated wastewater, biosolids, reuse water (and other products), and wastewater infrastructure resulting from AFFF products; [4] upgrade and/or modify infrastructure, including, but not limited to, design, construction, operation, and maintenance of systems related to PFAS contamination from AFFF products; [5] change biosolids reuse/disposal practices stemming from PFAS contamination from AFFF products; and [6] other response costs. Additionally, Plaintiff has and/or will incur lost profits and opportunities associated with biosolids and reuse water (among other products) due to contamination with PFAS resulting from AFFF products.

276. As a result of the contamination caused by Defendants' tortious acts and omissions, Plaintiff has lost use and enjoyment of their properties, including appropriated water rights, and have suffered annoyance, discomfort, and inconvenience.

277. Therefore, Plaintiff requests an Order providing for abatement and remediation of the private nuisance that Defendants have created, and enjoining Defendants from future violations.

278. As a result of the contamination, Plaintiff has lost use and enjoyment of their property,

including appropriated water rights, and have suffered annoyance, discomfort, and inconvenience.

## SIXTH CAUSE OF ACTION

## TRESPASS

## (By Plaintiff Against all Defendants)

279. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint as if fully set forth herein.

280. As a result of the Defendants' design, manufacture, sale, and/or distribution of AFFF, and its toxic PFAS components, releases of the toxic AFFF on March ARB have physically intruded onto and wrongfully entered the Plaintiff's property, including their groundwater, wastewater supply, wastewater treatment facility, sewer systems, piping, other fixtures, and biosolids interfering with Plaintiff's possessory interest in its properties without Plaintiff's permission.

281. The physical invasion of toxic PFAS contained in AFFF, designed, manufactured, sold, and/or distributed by Defendants to March ARB to be released onto and into Plaintiff's property has physically harmed its property, including contaminating its groundwater, wastewater supply, wastewater treatment facility, sewer systems, piping, other fixtures, biosolids, and other property with toxic PFAS. The toxic PFAS contained in AFFF which is contaminating Plaintiff's property would not have been present but for the Defendants' tortious actions. The physical intrusion of Defendants' AFFF, and its toxic PFAS components, onto property owned by Plaintiff has caused it to incur significant losses.

282. Invasion of Defendants' AFFF, and its toxic PFAS components, into Plaintiff's property and wastewater supply necessarily caused Plaintiff to act to mitigate the PFAS contamination throughout the wastewater treatment facility and its byproducts, including biosolids. Plaintiff was required to take all reasonable and necessary actions to remediate the contamination and ensure that it can process wastewater in compliance with regulatory requirements. Absent Defendants' tortious conduct, Plaintiff would not have been forced to confront these decisions nor take these actions or incur these costs.

283. As a direct result of Defendants conduct and resulting contamination of Plaintiff's groundwater, water supply, water systems, sewer systems, piping, other fixtures, biosolids, and other

property, by the toxic PFAS components of the Defendants' AFFF, the Plaintiff have incurred and will incur losses.

**SEVENTH CAUSE OF ACTION**

**UNJUST ENRICHMENT**

**(By Plaintiff Against all Defendants)**

284. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

285. Defendants are required to make restitution because Defendants have been unjustly enriched at the expense of Plaintiff.

286. Defendants received the benefit of commercial profits from the production, manufacture, distribution, and/or sale of AFFF containing PFAS and continued to do so long after they were aware of the health and environmental risks of their products and effects on Plaintiff.

287. Further, Defendants have failed to recall their products to prevent the further release of their AFFF into groundwater and onto Plaintiff's properties.

288. Through Defendants' actions and inactions at the expense of Plaintiff, Defendants have been unjustly enriched.

289. As a remedy, the Court should award to Plaintiff the expenditures saved and the profits obtained by Defendants at the expense of Plaintiff through Defendants' tortious conduct.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Western Municipal Water District, demands judgment against each Defendants, jointly and severally, and respectfully requests that this Court grant the following relief:

1. Compensatory damages according to proof including, but not limited to:

   a. Costs and expenses related to the past, present, and future investigation, sampling, testing, and assessment of the extent to which Plaintiff's property and municipal wastewater system have been contaminated with PFAS;

   b. Costs and expenses related to past, present, and future treatment and remediation of the PFAS contamination impacting Plaintiff's property and municipal

wastewater system; and

c. Costs and expenses related to past, present, and future installation and maintenance of filtration systems to assess and evaluate PFAS contamination impacting Plaintiff's property and water system;

2. A declaration that Defendants acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the health and safety of Plaintiff;

3. Attorney fees and costs, as provided by law;

4. Pre-judgment and post-judgment interest, as provided by law;

5. Punitive damages in an amount that fairly reflects the aggravating circumstances alleged herein, sufficient to punish Defendants for past harms, and deter Defendants' similar wrongful conduct in the future;

6. Consequential damages; and

7. All such other relief the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff respectfully request that this Court provide them with a jury trial on all causes of action for which a jury trial is available under the law.

SINGLETON SCHREIBER, LLP

Dated: December 16, 2024

By: ______________________
Gerald Singleton
Paul Starita
Britt K. Strottman
James Fendt
Attorneys for Plaintiff